UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------

SHAILON SIMMONS,

                              Plaintiff,              **MEMORANDUM & ORDER**
                                                      15-CV-0377 (MKB)

              v.

CAROLYN W. COLVIN
*Acting Commissioner, Social Security*
*Administration*,

                              Defendant.
--------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

       Plaintiff Shailon Simmons filed the above-captioned action pursuant to 42 U.S.C.

§ 405(g) seeking review of a final decision of the Commissioner of Social Security (the

"Commissioner") denying her claim for disability insurance benefits and Supplemental Security

Income ("SSI") benefits.  Plaintiff moves for judgment on the pleadings pursuant to Rule 12(c)

of the Federal Rules of Civil Procedure, claiming that the Administrative Law Judge Gal Lahat

(the "ALJ") (1) failed to properly develop the record in determining Plaintiff's residual

functional capacity ("RFC"), (2) improperly assessed Plaintiff's credibility, and (3) erred in his

application of the Medical-Vocational Guidelines.  (Pl. Mot. for J. on Pleadings, Docket Entry

No. 13; Pl. Mem. in Supp. of Mot. for J. on the Pleadings ("Pl. Mem."), Docket Entry No. 14.)

The Commissioner cross-moves for judgment on the pleadings, arguing that the ALJ's decision

is supported by substantial evidence and should be affirmed.  (Comm'r Not. of Cross-Mot. for J.

on Pleadings, Docket Entry No. 16; Comm'r Mem. in Supp. of Cross-Mot. for J. on the

Pleadings ("Comm'r Mem."), Docket Entry No. 17.)  For the reasons set forth below, Plaintiff's

motion for judgment on the pleadings is granted and the Commissioner's cross-motion for judgment on the pleadings is denied.

## I. Background

Plaintiff is a thirty-eight year old woman who earned at least one year of college credits towards an Associate's degree in accounting. (R. 45, 172.) Plaintiff last worked in December of 2009 as a hairdresser. (R. 37, 46–47, 132, 148, 152, 172, 209.) On November 16, 2011, Plaintiff applied for disability insurance benefits and SSI benefits, alleging that she was disabled since June 8, 2008, due to scoliosis, an esophageal tumor and anemia.[1] (R. 125, 129, 167–78.) Plaintiff's application was denied. (R. 81–86.) Plaintiff requested a hearing before the ALJ, which was held on July 8, 2013. (R. 35–76, 97–111.) The ALJ left the record open for over sixty days to allow Plaintiff's counsel to supplement the record with evidence related to her hospitalization in April of 2013 and a narrative to clarify her diagnoses. (R. 72–76.) By decision dated September 27, 2013, the ALJ found that Plaintiff was not disabled and denied Plaintiff's application. (R. 16–28.) On November 25, 2014, the Appeals Council denied review of the ALJ's decision. (R. 1–6.)

### a. Plaintiff's testimony

In 2008, Plaintiff underwent surgery for esophageal cancer, during which her esophagus was removed. (R. 40, 49.) Since the removal of her esophagus, Plaintiff has had daily difficulty eating food without vomiting. (R. 49.) At the time of the hearing, Plaintiff had lost approximately twenty pounds since 2009 as a result of her "eating conditions." (R. 49.)

---

[1] At the hearing before the ALJ, Plaintiff amended the alleged onset date of her disability to December 1, 2009. (R. 37–38.)

Plaintiff is anemic and she regularly experiences fatigue, lightheadedness, dizziness and shortness of breath due to her anemia. (R. 50.) Plaintiff had a hysterectomy, and her tiredness has increased since the procedure.[2] (R. 57.) Her anemia also makes it difficult for her to carry things. (R. 52.) For example, an eight pound bag of potatoes is too heavy for her to carry. (R. 52.) Plaintiff also has difficulty walking long distances and experiences shortness of breath after walking only three blocks. (R. 52.) She can only stand for thirty minutes before her back begins to hurt, although she has not received regular treatment for back pain. (R. 52, 64–65.) Plaintiff travels by bus, but has difficulty standing while she waits for the bus to arrive. (R. 56, 62.)

To treat her anemia, Plaintiff received multiple blood transfusions between 2009 and 2013, although she did not recall any transfusions in 2012. (R. 50–52, 57.) According to Plaintiff, when she sees a doctor, "they take her blood levels and they tell her to get blood transfusions." (R. 50.) In 2013, Plaintiff was taken by ambulance to a hospital to have a blood transfusion because she "literally could not stand up," was dizzy, and "was bleeding so heav[ily]." (R. 50.) Plaintiff does not go to the doctor regularly because she is afraid they will "keep" her in order to give her a blood transfusion. (R. 50.) Plaintiff had seen her new primary care physician, Dr. Murtezani, twice at his office and once while Plaintiff was in the hospital. (R. 55–56.)

At the time of the hearing, Plaintiff was living in a homeless shelter with her thirteen year-old son and she had lived there since August of 2012. (R. 44–45.) Plaintiff cleans, shops

---

[2] Plaintiff did not discuss her "hysterectomy" further. At the start of the hearing, Plaintiff's counsel explained that Plaintiff was diagnosed as having bilateral follicular cysts and, as a result of that condition, she had a hysterectomy. (R. 40.) Plaintiff's counsel further stated that Plaintiff "bleed[s] extensively, mostly vaginally," which is connected to her anemia. (R. 40.)

and does laundry with help from her son, and they eat meals provided by the shelter. (R. 53–54, 62–63.) Her son mops, sweeps and carries groceries for Plaintiff. (R. 53.) In 2012, Plaintiff had been drinking heavily and attended a relapse prevention program at the shelter where she lived. (R. 53–54, 60–61.) Since starting the program, Plaintiff only drank alcohol occasionally and, at the time of the hearing, she had not had a drink for two weeks. (R. 61.) Plaintiff had a driver's license and last drove in 2006. (R. 45.) Plaintiff communicates with her mother and cousin by telephone and occasionally sees her boyfriend. (R. 63–64.)

### b. Plaintiff's work history

Plaintiff last worked for three or four months in December of 2009 as a hairdresser.[3] (R. 37, 46–47, 132, 148, 152, 172, 189–90, 209.) Before that, in August of 2009, Plaintiff worked for one month as a direct care worker at the United Cerebral Palsy Association, (R. 128, 144, 158–61, 172, 189, 191), and she reported that on her last day, August 30, 2009, she was taken to the emergency room "because of the strain of work," (R. 161). In 2007, Plaintiff had a temporary job with the New York City Parks Department as part of a program that provided her with an apartment in exchange for work. (R. 58–59, 189.) From 2002 to 2006, Plaintiff worked as a caseworker for mentally ill clients, which involved assisting disabled individuals with tasks including food shopping and laundry and with transportation. (R. 47–48, 172, 189, 193, 209.) From 1998 to 2002, Plaintiff worked as a health aide, which involved assisting clients with "daily living activities." (R. 48, 172, 189, 194–95, 209.)

---

[3] In a self-employment work activity report completed for the SSA and dated November 21, 2011, Plaintiff stated that she had worked at home as a hairdresser from September of 2010 to December of 2010. (R. 148.)

### c. Vocational expert's testimony

Christina Boardman, a vocational expert, described Plaintiff's work as a hairdresser as light work with a specific vocational preparation ("SVP") of "3," which she explained was a lower rating because Plaintiff performed the work without specialized training. (R. 68–69, 115.) She also described Plaintiff's work as a case worker as light work with an SVP of "3." (R. 68.) She described Plaintiff's past work as a parks worker and health aide as "medium" work with an SVP of "2" and "3," respectively. (R. 68.)

### d. Medical evidence

#### i. New York Hospital of Queens

From March of 2008 through May of 2013, Plaintiff repeatedly visited New York Hospital of Queens, including the emergency department and the gynecological clinic.

##### 1. March 7, 2008 emergency department visit

On March 7, 2008, Plaintiff went to the emergency department of New York Hospital of Queens. (R. 410–22.) Plaintiff was treated by Dr. David Barlas, M.D., and complained that she was regurgitating food while eating and having difficulty swallowing solid food. (R. 410.) Plaintiff's solid food intake had "decreased" and she had experienced "mild" weight loss. (R. 410.) Plaintiff reported that she had an esophageal stricture and advised Dr. Barlas that it had responded to treatment by dilation three years earlier. (R. 410.) Dr. Barlas diagnosed Plaintiff with esophageal stricture and referred her to the gastroenterology department. (R. 411, 413, 421.)

##### 2. Dr. Paul Lee

For approximately five weeks in 2008, from at least May 16 to June 27, 2008, Plaintiff was treated by Dr. Paul Lee, M.D., for an esophageal tumor, first at New York Hospital of

Queens and then at New York Presbyterian Hospital. On May 16, 2008, a computerized tomography scan ("CT-scan") of Plaintiff's neck ordered by Dr. Lee revealed an esophageal mass in the upper esophagus, causing "marked narrowing." (R. 298–99.) There was "slight bulging of this mass into the proximal trachea." (R. 299.) An esophogram performed on the same day revealed a "severe stricture" due to an abnormal narrowing of Plaintiff's esophagus at the cervicothoracic junction. (R. 300.)

From June 2 to June 27, 2008, Plaintiff was hospitalized at New York Presbyterian Hospital. (R. 227–82.) Dr. Lee evaluated Plaintiff and treated her for a granular cell tumor of the cervical esophagus and a granular cell tumor of the stomach. (R. 227–82.) An upper endoscopy performed on June 3, 2008 revealed an esophageal mass with stricture of the esophagus. (R. 262–63, 281.) On June 4, 2008, Plaintiff had an esophageal biopsy. (R. 281.) On June 6, 2008, Dr. Lee surgically performed a partial esophageal resection to remove the tumor from Plaintiff's cervical esophagus. (R. 260–61, 281.) In a report dated June 16, 2008, Dr. Lee summarized the June 6 procedure and indicated that the he had performed: a flexible esophagoscopy; transcervical partial excision of cervical esophageal tumor; a cervical esophageal myotomy; and intraoperative dissection, requiring an "extra hour and a half" of surgery. (R. 260–61.) In the report, Dr. Lee stated that Plaintiff had a several-year history of dysphagia and had difficulty tolerating solid food. (R. 260.) He also noted that a multiple endoscopy and dilation had revealed a submucosal lesion in Plaintiff's esophagus and that biopsies had revealed spindle cells. (R. 260.)

According to Dr. Lee's July 16, 2008 notes, by June 10, 2008, Dr. Lee had performed: an exploratory laparotomy; a biopsy of gastric lesion; transhiatal esophagectomy; partial proximal gastrectomy; abdominal lymph node dissection; an "extra 45 minutes of intraoperative dissection

secondary to proximal tumor of the cervical esophagus with difficult anastomosis;" and the placement of a feeding J-Tube.  (R. 255–57, 281.)  Dr. Lee's postoperative diagnosis was "granular cell tumor of the cervical esophagus plus granular cell tumor of the stomach x2." (R. 255.)  On June 25, 2008, Dr. Lee performed flexible esophagoscopy on Plaintiff, who had a "leak in esophagogastric anastomosis."  (R. 258.)

On June 27, 2008, Plaintiff was discharged from New York Presbyterian Hospital, and Dr. Lee reported that Plaintiff was tolerating her feeding tube, her lungs were clear, she had no shortness of breath, and her abdomen was soft and nontender.  (R. 281.)  Dr. Lee noted that Plaintiff's postoperative course had been complicated by a fever and leukocytosis and that a small anastomotic leak had been discovered.  (R. 281.)  Dr. Lee prescribed medications for constipation and pain, and gave Plaintiff follow up instructions, including instructions about how to dress her surgical wounds.  (R. 281–82.)

### 3.   Dr. Subroto Paul

On August 12, 2008, Dr. Subroto Paul, M.D., who had assisted Dr. Lee with Plaintiff's earlier surgery, (R. 257), performed follow up surgical procedures — an esophagoscopy with dilation of Plaintiff's esophagus and an endoscopy — in order to treat Plaintiff's ongoing dysphagia and inability to eat without regurgitating her food, (R. 1208, 1213, 1220–1257).  Dr. Paul's post-operative diagnosis was dysphagia and anastomotic stricture.  (R. 1256.)  Dr. Paul explained that, during the procedure, "the anastomosis . . . was severely strictured and unable to accommodate the esophagoscope" and he reported that he had used "balloon dilation" to resolve the anastomotic stricture.  (R. 1256.)

### 4. CT-scans

Plaintiff had a number of CT-scans after her esophageal surgeries.[4] On December 12, 2008, a CT-scan of Plaintiff's lungs showed "status post esophagectomy" and scarring, but "no evidence of metastatic disease or recurrence." (R. 307.) On July 1, 2009, a CT-scan of Plaintiff's lungs showed status post partial esophagectomy and gastric pull through; minimal antelectatic changes at the right lung base; minimal subpleural nodular changes in the left upper lobe; and "no evidence of suspicious mass or metastatic disease." (R. 308–09.) On December 15, 2009, a chest CT-scan showed no minimal scarring and "no significant interval change." (R. 310–11.) On May 6, 2010, a chest CT-scan performed on Plaintiff revealed minimal scarring and a stable small subpleural nodule in the left upper lobe, but no evidence of metastatic disease. (R. 314–15, 380–81, 397–98.)

### 5. Gynecology clinic and emergency department visits from August 31, 2009 to March 24, 2010

On October 19, 2009, Plaintiff saw a physician's assistant at the New York Hospital of Queens gynecology clinic. (R. 385.) Plaintiff reported that she was having heavy and frequent menstrual cycles. (R. 385.) On examination, Plaintiff was in "no acute distress" and her abdominal and pelvic examinations were normal. (R. 385.) Plaintiff was diagnosed with menometrorrhagia — excessive and irregular uterine bleeding — and fibroid uterus. (R. 385.) On October 25, 2009, a transvaginal ultrasound performed on Plaintiff revealed a "large complex cyst" in Plaintiff's right ovary and unremarkable uterus and left ovary. (R. 309–10, 383–84.) Plaintiff followed up at the gynecology clinic on November 16, 2009 and was diagnosed with a

---

[4] Plaintiff has also had multiple chest x-rays, taken on July 8, 2008, (R. 301), August 8, 2008, (R. 305), August 12, 2008, (R. 306), and January 19, 2012, (R. 399), none of which revealed additional abnormalities or notable conditions.

"complex" ovarian cyst. (R. 386.) On December 15, 2009, a pelvic and endovaginal ultrasound revealed that the previously noted right ovarian cyst "had resolved" and that there was no evidence of a mass in Plaintiff's left ovary. (R. 312–14, 376–77, 392–93.)

Plaintiff returned to the gynecology clinic on April 7, 2010 and was treated by Dr. Cindy Cheung, M.D. (R. 387–88.) Plaintiff complained that she had been menstruating for three and a half weeks. (R. 387.) Plaintiff told Dr. Cheung she had refused a blood transfusion at Queens Hospital Center on March 24, 2010 and had been prescribed oral contraception pills instead. (R. 387.) Dr. Cheung noted that Plaintiff needed tests including a pelvic scan. (R. 388.)

### 6. November 18 to 22, 2010 hospitalization

Plaintiff was hospitalized at New York Hospital of Queens from November 18 to 22, 2010 for anemia and excessive vaginal bleeding. (R. 339–75, 400–09.) When she was admitted to the emergency room, Plaintiff complained of dizziness, weakness, chest tightness radiating to her back, and vaginal bleeding, for either the prior two days or two weeks. (R. 355–56.) Diane M. Sixsmith, M.D. examined Plaintiff. (R. 355.) Plaintiff reported that her skin appeared paler recently, that she was unable to walk up stairs without stopping due to fatigue, and that she was bruising more easily. (R. 355.) Plaintiff also reported that she had gone to her primary care physician, Dr. Fleming, earlier that day, and that he had sent her to the emergency department for a blood transfusion. (R. 355.) Dr. Sixsmith found that Plaintiff had no shortness of breath or weakness, (R. 355–56), that Plaintiff weighed 144 pounds, (R. 356), and that her skin was pale, (R. 362). Plaintiff's heart and lung examinations were normal. (R. 362.) Plaintiff was admitted to the hospital, diagnosed with severe anemia and treated with blood transfusions. (R. 356, 367, 373, 1069–1175.)

On November 19, 2010, a transvaginal ultrasound revealed bilateral follicular cysts.[5] (R. 318–19, 402–03, 408, 1115, 1143.) On the same date, Plaintiff was given an additional two units of blood by transfusion. (R. 1151.) On November 20, 2010, Dr. Justin Brandt, M.D., noted that Plaintiff was feeling better after the blood transfusion. (R. 1162.) Dr. Brandt diagnosed Plaintiff with menorrhagia, symptomatic anemia and suspected dysfunctional uterine bleeding as the etiology for menorrhagia, and prescribed Plaintiff with over the counter contraceptives. (R. 1162.) Upon her discharge, Plaintiff was again diagnosed with severe anemia and menorrhagia, was prescribed pain medication and oral contraceptives, and was advised that she could consume a regular diet and partake in all activities as tolerated. (R. 359.)

### 7. January 25, 2012 endoscopy and EDG

On January 25, 2012, based on the referral from her primary care physician, Dr. Kaumudi Somnay, M.D., performed an endoscopy and an esophagogastroduodenoscopy with biopsy on Plaintiff, to address her complaints of dysphagia and vomiting. (R. 325–38.) Plaintiff weighed 134 pounds. (R. 331.) The endoscopy revealed pyloric obstruction "status-post dilation erythema" and "stricture at anastomosis with dilation," but no "sonographic evidence of tumor recurrence." (R. 336.) The biopsy of Plaintiff's duodenum and stomach revealed no significant change. (R. 338.) The anastomosis site biopsy revealed squamous-gastric mucosa and mild acute gastritis, but no evidence of recurrent neoplasm. (R. 337.)

---

[5] On November 18, 2010, an echocardiogram ("ECG") showed normal results. (R. 401.) On November 19, 2010, an ECG revealed a T-wave abnormality that was a "probable normal variant." (R. 400.) On November 19, 2010, a CT-scan of the chest, taken because Plaintiff's history included an esophageal granular cell tumor, revealed subsegmental antelectasis in the right lower lobe, but no masses or evidence of metastatic disease. (R. 319–20, 403–04, 1144.)

### 8. June 7 to 12, 2012 hospitalization

Plaintiff was hospitalized at New York Hospital of Queens from June 7 to 12, 2012, for iron deficiency anemia secondary to "chronic" blood loss. (R. 832; *see* R. 832–1068.) Plaintiff told the hospital staff that her primary care doctor had sent her to the emergency room for a blood transfusion because her blood tests showed anemia, as demonstrated by her hemoglobin and hematocrit levels. (R. 923.) She reported that her last blood transfusion had been in 2010. (R. 924.) Plaintiff also reported having experienced "several months" of mild fatigue, generalized weakness, and dizziness. (R. 923–24, 936, 1042.) She had started menstruating the day before she was hospitalized. (R. 924.) Plaintiff was examined and found to be in no apparent distress, with normal cardiovascular, lung, and musculoskeletal examinations. (R. 924.) Plaintiff was diagnosed with "severe anemia." (R. 849, 936.)

On June 7 and 8, 2012, Plaintiff received blood transfusions. (R. 873–76.) On June 8, 2012, a CT-scan of Plaintiff's abdomen and pelvis revealed post inflammatory changes and nonspecific cystic focus in the left adnexa, and no evidence of bowel obstruction or acute inflammation. (R. 913–14.) On June 9, 10 and 11, 2012, Plaintiff was assessed by various hospital staff members as having no impairment in mobility or activity and it was noted that she walked frequently. (R. 990, 1007, 1012.)

A colonoscopy performed on June 11, 2012 revealed external hemorrhoids, but "no other mass lesions." (R. 855, 861.) On June 11, 2012, Plaintiff reported that she was having difficulty swallowing solid food. (R. 671, 990.) A nutritionist noted that Plaintiff had no apparent recent weight loss. (R. 1040.) An esophagogastroduodenoscopy performed on June 12, 2012 revealed mild duodenitis and antral gastritis. (R. 832, 869.)

### 9.    February 6 to 11, 2013 hospitalization

Plaintiff was hospitalized at New York Hospital of Queens from February 5 to 11, 2013, for excessive and frequent menstruation and anemia due to blood loss.  (R. 457, 476; *see* R. 457–831.)  Plaintiff presented with heavy vaginal bleeding, which had been ongoing throughout the two and a half weeks preceding her hospitalization, and had worsened over the five days prior to her hospitalization.  (R. 461, 671.)  She also reported palpitations, lightheadedness and shortness of breath during exertion.  (R. 461, 671.)  Plaintiff stated that she had not eaten in three days.  (R. 461.)

Plaintiff was examined by Dr. Vinnay Gunnala, M.D.  (R. 671–72.)  Dr. Gunnala's examination noted active bleeding from the uterus with large clots, (R. 672), and he removed 200cc's of blood and clot, (R. 671–72).[6]  On February 6, 2013, a pelvic ultrasound revealed a mass that was inseparable from the caudal cervix and upper vagina, and normal thickness of the endometrium.  (R. 1305–06.)  Plaintiff received blood transfusions on February 7 and 8, 2013.  (R. 457, 561–77, 782.)  She was also treated with intravenous fluids and medication to reduce bleeding.  (R. 672.)

On February 8, 2013, Plaintiff underwent a hysteroscopy, a procedure used to investigate and diagnose uterine bleeding, and dilation and curettage, which revealed ostia and blood clots, but no discrete masses.  (R. 486–87, 503.)  On February 9, 2013, an intrauterine balloon was inserted for severe menorrhagia and symptomatic anemia; and was subsequently removed. (R. 767, 783.)

---

[6] Cardiovascular, lung, musculoskeletal, neurological, and psychiatric examinations that were performed that day also showed normal results.  (R. 658.)

On February 9, 2013, Plaintiff had surgery to remove a retained intrauterine contraceptive device. (R. 491.) That afternoon, Plaintiff consumed lunch and left the ward to have a cigarette. (R. 530.) By February 10, 2013, Plaintiff had minimal bleeding and a stable hematocrit level and was hemodynamically stable. (R. 767.) An examination revealed that Plaintiff had no impairments to her mobility. (R. 786.) On February 11, 2013, Plaintiff was diagnosed with anemia and menometrorrhagia, and was discharged in stable condition. (R. 476, 796.) At the time of her discharge, Plaintiff was feeling much better and had no vaginal bleeding. (R. 476, 796.) It appears that, on March 7, 2013, within a month of her release, Plaintiff received another blood transfusion. (R. 566.)

### 10. March of 2013 gynecology clinic visits

Plaintiff returned to the gynecology clinic at New York Hospital of Queens on March 11, 2013, to follow-up regarding her hospitalization in February. (R. 1380–81.) She weighed 131 pounds. (R. 1380.) On March 26, 2013, an MRI of Plaintiff's pelvis revealed a normal uterus with no endometrial fluid, no cervical masses, normal ovaries and no evidence of adnexal mass. (R. 1390–91.) An ultrasound of Plaintiff's abdomen, also performed on March 26, 2013, revealed "fatty infiltration" of the liver, rather than chronic liver disease, and no evidence of cholelithiasis or biliary dilation. (R. 1392–93.)

### 11. March 29, 2013 emergency department visit

On March 29, 2013, Plaintiff went to the emergency department of New York Hospital of Queens, complaining of vomiting and abdominal swelling for the prior five days. (R. 1284–85; *see* R. 1279–1301.) She reported a stabbing back pain that radiated to her stomach, nausea and vomiting. (R. 1284–85.) A gastrointestinal examination revealed mild epigastric tenderness and a distended stomach. (R. 1285.) Gynecological and musculoskeletal examinations were normal,

with no vaginal discharge. (R. 1292.) Dr. Saumil Parikh, M.D., examined Plaintiff and diagnosed her with anemia and menometrorrhagia. (R. 1289.) A CT-scan of Plaintiff's abdomen and pelvis showed: no significant interval change, status post esophagectomy and gastric pull up, hepatic stenosis, and no acute abdominal or pelvic findings. (R. 1278.) A CT-scan of her chest showed: minimal bibasilar dependent altelectasis; unremarkable thyroid; no significant pericardial or pleural effusion; mild bilateral dependent atelectasis; and a left upper lobe nodule consistent with benignity by size. (R. 1277.) Plaintiff improved and was discharged the same day, with a diagnosis of abdominal pain and anemia due to excessive blood loss caused by frequent menstruation. (R. 1298.)

### ii. Dr. Skender Murtezani

Plaintiff first saw Dr. Skender Murtezani, M.D., on April 11, 2013, at which time Plaintiff complained of stomach pain and swelling. (R. 1432–33.) Plaintiff stated that she drank alcohol and was trying to cut back and that she smoked one-half pack of cigarettes each day. (R. 1432.) Plaintiff weighed 142 pounds. (R. 1433.) Examinations were within normal limits for the eyes, ears/nose/throat, neck, thyroid, respiratory, musculoskeletal, neurological, psychiatric and endocrine. (R. 1433.) Plaintiff's stomach was somewhat distended, and there was mild swelling in the left lower extremity. (R. 1433.)

On April 13, 2013, Dr. Murtezani noted a heart murmur and ordered x-rays of Plaintiff's lumbosacral spine and an x-ray of Plaintiff's abdomen. (R. 1413–16). Her lumbar spine x-rays revealed normal alignment, osseous structures, disc spaces, and sacroiliac joints. (R. 1413–14.) A CT-scan of Plaintiff's abdomen and pelvis was performed on April 15, 2013, due to epigastric pain and abdominal extension and showed hepatomegaly (enlarged) and extensive fatty infiltration of the liver. (R. 1444–45.) The gallbladder, spleen, kidneys and pancreas were

normal.  (R. 1444.)  There was no bowel obstruction or evidence of diverticulitis or appendicitis.  (R. 1444.)

On April 17, 2013, Dr. Murtezani sent Plaintiff to New York Hospital of Queens due to persistent abdominal pain and transaminitis.  (R. 1434.)  The supervising physician, Dr. Samar Hameed, M.D., noted that Plaintiff had been admitted with worsening abdominal bloating and nausea, and that imaging showed chronic gastritis.  (R. 1436.)  Plaintiff's stomach pain and constipation improved with pain medication. (R. 1436.)  She was tolerating a diet that was high in fiber and low in fat and she was advised to eat frequent meals.  (R. 1436.)  A biopsy of Plaintiff's gastric antrum was performed and it revealed chronic gastritis with intestinal metaplasia, but was negative for helicobacter pylori.  (R. 1447–48.)  A biopsy of Plaintiff's gastrointestinal junction revealed chronic cardioesophagitis and was negative for dysplasia and goblet cell metaplasia.  (R. 1447–48.)  Plaintiff's diagnoses upon her discharge were gastritis, with no significant pathology other than fatty liver and hiatal hernia, and stable transaminitis, which was likely secondary to alcohol abuse. (R. 1434, 1436.)  She was encouraged to stop drinking alcohol.  (R. 1436.)

Plaintiff returned to Dr. Murtezani on May 9, 2013.  (R. 1431.)  Plaintiff weighed 132 pounds.  (R. 1431.)  Dr. Murtezani noted a heart murmur and organomegaly, or enlargement of the abdomen.  (R. 1431.)  Dr. Murtezani's examination of Plaintiff's musculoskeletal system revealed no edema and a good range of motion.[7]  (R. 1431.)

---

[7] Pulmonary function studies performed on Plaintiff suggested an unconfirmed report of severe obstruction and moderately severe restriction.  (R. 1430.)  The results were not reproducible, and therefore no interpretation was possible.  (R. 1429.)

### iii. Queens Hospital Center

Plaintiff has also occasionally visited the emergency department at Queens Hospital Center. On August 31, 2009, Plaintiff went to the emergency department for vaginal bleeding. (R. 287–88.) Plaintiff reported lower back pain due to heavy lifting at a new job. (R. 287.) She also reported recent alcohol use. (R. 287.) Plaintiff was diagnosed with anemia due to vaginal bleeding. (R. 288.)

On March 24, 2010, Plaintiff again went to the emergency department at Queens Hospital Center for abdominal pain and vaginal bleeding. (R. 284–86.) Plaintiff's complaints included loss of appetite, vomiting blood, bloody diarrhea, fever, dizziness, blurred vision and headache. (R. 284.) She was found to be in "no acute distress." (R. 285.) A pelvic exam revealed an enlarged uterus, and she was diagnosed with anemia due to vaginal bleeding. (R. 285.)

### iv. Dr. Linell Skeene, consultative medical examiner

On April 6, 2012, Dr. Linell Skeene, M.D., conducted a medical examination of Plaintiff at the request of the Social Security Administration. (R. 428–31.) Dr. Skeene identified Plaintiff's chief complaint as difficulty swallowing, dating back to 2007, prior to her diagnosis of esophageal cancer. (R. 428.) Dr. Skeen recounted that Plaintiff had a resection of the esophagus in 2008 and continued to have difficulty swallowing solid foods, although she could swallow liquids and pureed food. (R. 428.) In recounting Plaintiff's medical history, Dr. Skeene stated that "[a]s a result of the resection of [Plaintiff's] esophagus, [she] has become severely anemic." (R. 428.) Plaintiff reported multiple blood transfusions in 2010 and "weakness secondary to the anemia." (R. 428.) Plaintiff had been prescribed ferrous sulfate, which is used to treat iron deficiency; famotidine, which treats stomach acid and heartburn; and Benadryl. (R. 428.)

Dr. Skeene noted that Plaintiff reported being able to shower, bathe and dress independently.  (R. 429.)  Plaintiff stated that she could cook and clean and do limited laundry and shopping.  (R. 429.)  Plaintiff denied drinking alcohol and stated that she smokes one-half of a pack of cigarettes each day and that, while she had smoked marijuana in the past, she had stopped.  (R. 428.)

On examination, Dr. Skeene observed that Plaintiff "appeared to be in no acute distress." (R. 429.)  Plaintiff walked with a normal gait and without an assistive device and was able to walk on her heels and toes without difficulty.  (R. 429.)  Plaintiff's stance was normal and she could squat fully, rise from a chair without difficulty, and change her clothes and get on and off the examination table without assistance.  (R. 429.)

Plaintiff was sixty-two inches tall and weighed 131 pounds.  (R. 429.)  She had a soft abdomen, "nontender," without masses or abdominal bruits.  (R. 430.)  She exhibited full ranges of motion in her cervical and lumbar spines, shoulders, elbows, forearms, wrists, hips, knees and ankles.  (R. 430.)  Her upper and lower extremities had "5/5" strength."  (R. 430.)  Plaintiff's joints were stable and nontender, and she exhibited no redness, heat, swelling or effusion. (R. 430.)  Her deep tendon reflexes were physiologic and equal.  (R. 430.)  Plaintiff had no sensory deficits or muscle atrophy.  (R. 430.)  Plaintiff had intact hand and finger dexterity and her grip strength was "5/5" bilaterally.  (R. 430.)

Dr. Skeene diagnosed Plaintiff with "status post complete resection of the esophagus for cancer" and anemia.  (R. 430.)  Dr. Skeene opined that Plaintiff had "moderate limitation for general activity due to difficulty swallowing" and "weakness secondary to cancer of the esophagus."  (R. 431.)

### v. Dr. Sagapuram, non-examining medical consultant

On June 6, 2012, Dr. Yadavendra Y. Gowd Sagapuram, M.D., a state agency medical consultant, reviewed Plaintiff's medical records.[8] Dr. Sagapuram noted that Plaintiff had a hemocrit level of 22.4, that she "has had only one transfusion of five units" and that she "also ha[d] benign esophagitis." (R. 437.) Dr. Sagapuram diagnosed Plaintiff with "chronic nutritional iron deficiency anemia, symptomatic with dysphagia for solid foods and fatigue." (R. 435, 437; *see* R. 219.) Dr. Sagapuram stated that Plaintiff "does not meet 7.02," the Listing pertaining to anemia. (R. 435.) Dr. Sagapuram further opined that, "based on medical evidence in [the] file," Plaintiff could sit for six hours, stand and walk for two hours per day, and occasionally lift up to ten pounds. (R. 435.) Dr. Sagapuram opined that Plaintiff's weight of 131 pounds was "not clinically significant." (R. 437.)

### e. Additional evidence

#### i. Function report

On January 14, 2012, Plaintiff completed a function report as part of her application for disability and SSI benefits. (R. 180–88.) Plaintiff stated that she and her son were living in a house. (R. 180–81.) Plaintiff stated that she had "extreme back pain, severe anemia, [and] digestive problems" due to the removal of her esophagus because of granular cell tumors. (R. 188.) According to Plaintiff, she only eats once a day to "prevent getting sick." (R. 183.) Plaintiff reported that some days she is so weak that she has to stay in bed and sometimes she is unable to sleep. (R. 181, 187.) She explained that, before she began suffering from her conditions, she was "able to eat normally, had more stamina, [and] didn't get winded walking or

---

[8] The record also reflects that, on April 23, 2012, non-examining State agency review physician Dr. Ramona Minnis, M.D., found the evidence insufficient to address Plaintiff's limitations resulting from chronic severe anemia and her "benign esophageal tumor." (R. 432.)

climbing stairs." (R. 181.) Plaintiff also "use[d] to have energy to travel and visit people" but is "always tired now." (R. 185.)

Plaintiff stated that she cannot lift heavy items, (R. 185), and requires assistance with chores and lifting or carrying bags, (R. 183). If she stands for long periods of time, her "back throbs." (R. 185.) Plaintiff gets experiences shortness of breath when she climbs stairs. (R. 186.) Plaintiff has no problem with personal care and can prepare meals daily. (R. 181–82.) She is able to attend appointments, shop for groceries, do laundry, ride public transportation, pay bills and manage a savings account. (R. 183–84.) She is able to pay attention but cannot finish what she starts without periods of rest. (R. 187.) Plaintiff watches television and speaks on the telephone daily, but is "not as active or social anymore." (R. 184–85.)

### ii. Disability report

In a field office disability report filed with Plaintiff's request for an ALJ hearing, (R. 201–07), Plaintiff stated that she had been "losing blood" and had required another transfusion, (R. 203). She reported that she always felt weak and was "unable to do much cleaning around the house." (R. 205.) Plaintiff stated that her son does most of the cleaning, and that he helps her with shopping for groceries. (R. 205.) She explained that she does not leave the house unless necessary, because she does not have the energy. (R. 205.)

### f. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the Social Security Act (the "SSA"). First, the ALJ found that Plaintiff met the insured status requirements of the SSA through December 31, 2013, and that Plaintiff had not engaged in substantial activity since December 1, 2009, the alleged onset date. (R. 21–22.) Second, the ALJ found that Plaintiff had the following combination of

impairments, which was severe: "liver impairment with steatosis; history of cancer (granular cell tumors of the esophagus and stomach, status most resection with cardio esophagitis, gastritis, and hiatal hernia; anemia, status post hysterectomy." (R. 22.) The ALJ explained that the record supports a finding that the combination of impairments is severe because "when considered together, the combination . . . imposes more than [a] slight limitation on [Plaintiff's] ability to perform basic work activities."[9] (R. 22.)

Third, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or is equal to the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations. (R. 22.) The ALJ stated that he considered Listings 5.00, pertaining to disorders of the digestive system, 7.00, pertaining to hematological disorders, and 13.00, pertaining to impairments related to malignant cancers, and determined that Plaintiff's "severe combination of impairments" does not meet or medically equal the criteria of those listings. (R. 22.)

Next, the ALJ determined that Plaintiff "has the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR [§§] 404.1567(a) and 416.967(a)." (R. 23.) The ALJ found that Plaintiff is "able to lift, carry, push and pull up to 10 pounds occasionally and less than 10 pounds frequently" and is "able to stand and walk for two hours during an eight-hour workday, and sit for six hours during an eight-hour workday." (R. 23.) The ALJ did not make any finding as to Plaintiff's non-exertional RFC.

As to Plaintiff's disability, the ALJ determined that, while Plaintiff's "medically

---

[9] The ALJ further found that Plaintiff has a non-severe pulmonary impairment and a non-severe cardiac impairment. (R. 22.) He stated that, while the record "does not refute" Plaintiff's allegation of scoliosis, the record "fails to establish scoliosis or any other orthopedic condition as a medically determinable impairment." (R. 22.)

determinable impairments could reasonably be expected" to cause Plaintiff's symptoms, Plaintiff's statements concerning the "intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained." (R. 25.) The ALJ stated that he considered seven factors as well as the objective medical evidence in assessing Plaintiff's credibility.[10] (R. 25.) The ALJ noted that Plaintiff described "generally intact daily activities," and that, although she "reported requiring rest breaks between tasks, she also reported her ability to engage in childcare as intact." (R. 26.) The ALJ noted that Plaintiff told the consultative examiner that she is capable of maintaining her personal hygiene independently, cooking, cleaning, doing some laundry and shopping, and that she is able to take public transportation and to attend a recovery program, which met for five hours each week since September of 2012. (R. 26.) Thus, the ALJ "accorded limited weight" to Plaintiff's allegations and testimony, (R. 26), and concluded that Plaintiff's "allegations of disability are not supported by the medical and other evidence of record," (R. 25).

The ALJ found Plaintiff's medical care to be "routine and conservative on the whole." (R. 26.) He noted that her cancer treatment ended in 2008 and that the "majority of her treatment recently rendered was in association with bleeding and the need for a hysterectomy." (R. 26.)

---

[10]  The factors, as provided by the ALJ, are:
> (i) The claimant's daily activities; (ii) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (iii) [p]recipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (v) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (vi) any measures other than treatment that the claimant uses or has used to relieve pain or other symptoms . . . ; and (vii) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

(R. 25.)

The ALJ stated that Plaintiff has needed blood transfusions "on occasion, but not consistently, over the period at issue." (R. 26.) The ALJ described Plaintiff's use of medications as "limited," "[a]side from [the use of medications] during procedures or in the course of hospitalization," and noted that at the time of her initial application, Plaintiff only reported taking an iron supplement and that, at the time of her appeal, she reported taking one additional medication to control stomach acid. (R. 26.)

As to Plaintiff's complaints of scoliosis and back pain, the ALJ found that "the record fails to confirm complaints of back pain or findings supportive of a medically determinable impairment." (R. 26.) The ALJ noted that, although Plaintiff has been prescribed pain medication "at times," the record "fails to reflect a correlation between the use of pain medication and an orthopedic medically determinable impairment." (R. 26.) Thus, the ALJ concluded that, "[a]lthough [Plaintiff] has experienced significant medical issues," that have "resulted in[] work related limitations, the record as a whole does not support a finding that [Plaintiff] is prevented from performing basic work activities." (R. 26.)

In reaching this conclusion, the ALJ accorded the opinion of the consultative internist examiner, Dr. Skeene, "considerable weight" because the opinion is that of a "qualified physician who examined" Plaintiff. (R. 24.) The ALJ also found Dr. Skeene's "medical and other findings . . . to be consistent" with Dr. Skeene's opinions as to "the extent" of Plaintiff's limitations and with "the above residual functional capacity assessment." (R. 24.) The ALJ conceded that Dr. Skeene's opinion as to the "extent of the limitations" "is not specific," but noted that "the psychical examination did not reveal any significant abnormalities" and that Plaintiff's "blood work reflected some abnormalities consistent with the nature of the impairments, as documented in the totality of the record." (R. 24.) The ALJ explained that Dr.

Skeene found Plaintiff "to be in no acute stress" and that she "had a normal gait, could walk on [her] heels and toes without difficulty," could fully squat and had a "normal" stance and did not need assistance during the examination. (R. 24.) The ALJ noted that Dr. Skeene found "no abnormalities in the musculoskeletal system or extremities" and opined that Plaintiff has "moderate limitations for general activity due to difficulty swallowing, as well as weakness secondary to cancer of the esophagus." (R. 24.) The ALJ also noted that blood work taken during Dr. Skeene's examination of Plaintiff "revealed below average hemoglobin as well as abnormal red and white blood cell counts." (R. 24.)

The ALJ also accorded "considerable" weight to the opinion of the state medical consultant, Dr. Sagapuram, who opined that Plaintiff could lift ten pounds "occasionally," sit for six hours, and stand or walk for two hours. (R. 25.) The ALJ found that the opinion "appears supported by the overall record," although Dr. Sagapuram did not examine Plaintiff and rendered the opinion "prior to the receipt of additional medical evidence." (R. 25.) The ALJ determined that the evidence received at the hearing was "consistent" with Dr. Sagapuram's assessment. (R. 25.)

Finally, the ALJ determined that Plaintiff was not capable of performing her prior relevant work as a hairdresser or case worker, because those jobs required tasks that exceeded the RFC assessed by the ALJ. (R. 26.) The ALJ concluded that, given Plaintiff's age, education, work experience, and capacity for the "full range of sedentary work," jobs in the national economy that Plaintiff could perform existed in significant numbers. (R. 27.) Therefore, the ALJ determined that, from December 1, 2009 through the date of the decision, Plaintiff has not been suffering from a "disability" as this term is defined under the SSA. (R. 27.)

## II.  Discussion

### a.  Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).  "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same).  Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted).  In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").  The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted).  If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner.  *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'"

*McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008)

(alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b. Availability of benefits

SSI is available to individuals, among others, who are "disabled" within the meaning of

the Act.[11]  Federal disability insurance benefits are also available to individuals who are

"disabled" within the meaning of the Social Security Act.  For purposes of both SSI and

disability benefits eligibility, to be considered disabled under the Act, a plaintiff must establish

his or her inability "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve months."

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A)..  The impairment must be of "such severity that he is

not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national

economy."  *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner has promulgated a five-step

analysis for evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit

has described the steps as follows:

> The first step of this process requires the [Commissioner] to
> determine whether the claimant is presently employed.  If the
> claimant is not employed, the [Commissioner] then determines
> whether the claimant has a "severe impairment" that limits her
> capacity to work.  If the claimant has such an impairment, the
> [Commissioner] next considers whether the claimant has an
> impairment that is listed in Appendix 1 of the regulations.  When
> the claimant has such an impairment, the [Commissioner] will find
> the claimant disabled.  However, if the claimant does not have a
> listed impairment, the [Commissioner] must determine, under the

---

[11] SSI is available to individuals who are sixty five years of age or older, blind or disabled and meet certain income requirements.  42 U.S.C. §§ 1382(a), 1382c(a)(1)(A); 20 C.F.R. § 416.202.  The only issue before the Court is whether Plaintiff is disabled.

fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims"); *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

### c. Analysis

Plaintiff moves for judgment on the pleadings, arguing that the ALJ (1) failed to properly develop the record in determining Plaintiff's RFC, in particular by failing to re-contact Dr. Murtezani, (2) improperly assessed Plaintiff's credibility, and (3) erred in his application of the Medical-Vocational Guidelines. (Pl. Mem 11–17.) The Commissioner cross-moves for judgment on the pleadings, arguing that the ALJ's decision is supported by substantial evidence and that the ALJ had no obligation to re-contact Dr. Murtezani because the medical record provided substantial evidence for the ALJ's RFC determination. (Comm'r Mem. 16–25.)

### i. The ALJ's RFC determination was not supported by substantial evidence

Plaintiff argues that the ALJ's determination was not supported by substantial evidence because the ALJ (1) relied on the opinion of Dr. Skeene, whose assessment of Plaintiff's capabilities was too vague, (2) relied on the opinion of Dr. Sagapuram, who did not examine Plaintiff, and (3) failed to develop the record by re-contacting Plaintiff's treating physician, Dr. Murtezani, to obtain an opinion. (Pl. Mem. 11–16.) Plaintiff also argues that the ALJ failed to

consider Plaintiff's non-exertional limitations. (*Id*. at 16–17.) The Commissioner argues that the RFC determination was supported by the findings and opinion of both Drs. Skeen and Sagapuram, whose opinions the ALJ gave "considerable" weight, and that the ALJ was not obligated to re-contact Dr. Murtezani because the ALJ left the record open so that Plaintiff's counsel could obtain additional records and, in any event, the record was sufficiently developed to provide a basis for the ALJ's RFC determination. (Comm'r Mem. 16–22.) The Commissioner also argues that the ALJ found that Plaintiff had no non-exertional limitations that would limit her ability to work. (*Id*. at 24–25.)

An RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545. With respect to a claimant's physical abilities, an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis. *Id*. § 404.1545(b). For example, "a limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work." *Id*. In determining the RFC, "the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 312 (W.D.N.Y. 2013) (alteration in original) (quoting *Stanton v. Astrue*, No. 07-CV-0803, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(b–e)), *aff'd*, 370 F. App'x (2d Cir 2010)). "Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and

has committed legal error." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) (first citing *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000); and then citing *Zorilla v. Chater*, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996)).

"Before an ALJ classifies a claimant's RFC based on exertional levels of work (*i.e.*, whether the claimant can perform sedentary, light, medium, heavy or very heavy work) he 'must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . .'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)). Social Security Ruling 96-8p notes that "a failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions." *Id.* at 176 (quoting SSR 96–8p, 1996 WL 374184, at *4). The Second Circuit has held that failure to conduct an explicit function by function analysis at the RFC finding step is not *per se* error requiring remand, but it has reiterated that "remand may be appropriate, where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record." *Id.* at 177.

The ALJ determined that Plaintiff has the RFC to perform the full range of sedentary work.[12] (R. 23.) The ALJ found that Plaintiff is "able to lift, carry, push and pull up to 10 pounds occasionally and less than 10 pounds frequently" and is "able to stand and walk for two

---

[12] Sedentary work is defined as work that:

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

*Brown v. Colvin*, --- F. Supp. 3d ---, ---, 2015 WL 7313877, at *2 n.1 (W.D.N.Y. Nov. 20, 2015) (quoting 20 C.F.R. § 404.1567(a)).

hours during an eight-hour workday, and sit for six hours during an eight-hour workday."

(R. 23.)  The ALJ concluded that, "[a]lthough [Plaintiff] has experienced significant medical

issues" that have "resulted in[] work related limitations, the record as a whole does not support a

finding that [Plaintiff] is prevented from performing basic work activities."  (R. 23.)  In reaching

his RFC determination, the ALJ relied on: (1) Dr. Skeene's opinion that Plaintiff has "moderate

limitations for general activity" due to swallowing and "weakness secondary to cancer of the

esophagus" and (2) Dr. Sagapuram's opinion as to Plaintiff's limitations.  (R. 24–25.)

1. **Dr. Skeene's opinion does not provide substantial evidence for the RFC determination**

Dr. Skeene opined that Plaintiff has "moderate limitations for general activity."  (R. 431.)

This assessment is too vague to provide sufficient support for the ALJ's specific functional

assessments that Plaintiff could, for example, carry ten pounds occasionally and less than ten

pounds frequently and sit for six hours during an eight-hour workday.  *See Selian*, 708 F.3d at

421 ("[The consultative examiner's] opinion is remarkably vague.  What [the consultative

examiner] means by 'mild degree' and 'intermittent' is left to the ALJ's sheer

speculation. . . .   [The] opinion does not provide substantial evidence to support the ALJ's

finding that [the claimant] could lift 20 pounds occasionally and 10 pounds frequently."); *Ubiles

v. Astrue*, No. 11-CV-6340, 2012 WL 2572772, at *11 (W.D.N.Y. July 2, 2012) (holding that the

consultative examiner's opinion that the plaintiff had "moderate limitations in standing, walking,

climbing stairs, and lifting minor weights . . . was entirely too vague to serve as a proper basis

for an RFC" (collecting cases)); *Hilsdorf*, 724 F. Supp. 2d at 348 (holding that the consultative

examiner's "statement that [the] [p]laintiff had 'limitations of a mild degree of lifting, bending,

walking, standing, and pushing and pulling on arm controls'" could not "serve as an adequate

basis for determining [the] [p]laintiff's RFC" because it "did not provide enough information to

allow the ALJ to make the necessary inference that [the] [p]laintiff could perform sedentary work").

The ALJ acknowledged that Dr. Skeene's opinion as to the "extent of the limitations" was "not specific." (R. 24.) The ALJ nevertheless determined that Dr. Skeene's opinions were consistent with her findings, because "the physical examination did not reveal any significant abnormalities" and Plaintiff's bloodwork "reflected some abnormalities consistent with the nature of the impairments." (R. 24.) Although Dr. Skeene's findings included detailed observations of Plaintiff's functioning, the findings did not address Plaintiff's capabilities relevant to sedentary work.[13] *See Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000), *superceded by statute on other grounds*, 20 C.F.R. § 404.1560(c)(2). As the Second Circuit stated in *Curry*, "[w]hile the opinions of treating or consulting physicians need not be reduced to any particular formula, [the consultative examiner's] opinion is so vague as to render it useless in evaluating whether [claimant] can perform sedentary work." *Id.* (explaining that, "[i]n particular, [consultative examiner's] use of the terms 'moderate' and 'mild,' without additional information, does not permit the ALJ, a layperson notwithstanding her considerable and constant exposure to medical evidence, to make the necessary inference that [claimant] can perform the exertional requirements of sedentary work").

Moreover, even where courts have approved of an ALJ's assignment of significant weight to findings by a consultative physician of "moderate" limitations, such assessments have

---

[13] Dr. Skeene observed that Plaintiff "appeared to be in no acute distress," that she walked with a normal gait and without an assistive device and was able to walk on her heels and toes without difficulty. (R. 429.) She further observed that Plaintiff's stance was normal and she could squat fully, rise from a chair without difficulty, and change her clothes and get on and off of the examination table without assistance. (R. 429.) Dr. Skeene noted full ranges of motion and full upper and lower body strength. (R. 429.)

directly considered a plaintiff's capacity to, for example, sit or stand for long periods. *See Harrington v. Colvin*, No. 14-CV-6044, 2015 WL 790756 at *13, 14 (W.D.N.Y. Feb. 25, 2015) (finding that a medical opinion that a claimant was "moderately" limited in sitting, standing and walking was not inconsistent with the ALJ's residual functional capacity that plaintiff could sit, stand, and walk for six hours a day); *Nelson v. Colvin*, 12-CV-1810, 2014 WL 1342964, *12 (E.D.N.Y. March 31, 2014) (stating that an ALJ's finding that a plaintiff could perform light work was supported by the doctor's opinion that the claimant had mild to moderate limitations to her ability to sit, stand and walk) (citing *Lewis v. Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013)). Here, Dr. Skeene merely opined that Plaintiff had moderate limitations to her abilities with respect to "general activity," (R. 429), which does not provide substantial evidence to support the ALJ's RFC determination that Plaintiff can perform the full range of sedentary work.[14]

The ALJ also improperly found that Dr. Skeene's "medical and other findings" were "consistent" with "the above residual functional capacity assessment." (R. 24.) Because an ALJ "should use medical opinions to determine" the RFC, the ALJ "cannot give medical opinions weight based on their consistency with the RFC," as such "reasoning is circular and flawed." *Faherty v. Astrue*, No. 11-CV-02476, 2013 WL 1290953, at *14 (E.D.N.Y. Mar. 28, 2013) ("The ALJ explained the reason for giving [the consultative examiner's] medical source statement significant weight was that it was consistent with her RFC." (internal citation to record omitted));

_____

[14] Because it is contradicted by the medical record, Dr. Skeene's report fails to provide substantial evidence for the RFC. Dr. Skeene diagnosed Plaintiff with "status post complete resection of the esophagus for cancer" and anemia. (R. 429.) While Dr. Skeene noted that Plaintiff reported multiple blood transfusions in 2010 and "weakness secondary to the anemia," Dr. Skeene identified Plaintiff's chief complaint as difficulty swallowing and stated that Plaintiff's anemia was the result of the resection of her esophagus. (R. 429.) This determination is contradicted by Plaintiff's treatment records, including those available at the time of Dr. Skeene's examination, which reflect consistent diagnoses for anemia resulting from excessive vaginal bleeding and menorrhagia. (*See* R. 359, 367, 373, 400–09, 832.)

*see Wahler v. Colvin*, No. 11-CV-1096, 2014 WL 6390320, at *11 (W.D.N.Y. Nov. 17, 2014)

("[T]he ALJ rejected [the medical] opinion *because* it reached a conclusion with which the ALJ

disagreed — that Plaintiff is disabled. This is clearly improper." (citation omitted)); *Snyder v.*

*Colvin*, No. 13-CV-585, 2014 WL 3107962, at *6 (N.D.N.Y. July 8, 2014) (An ALJ's statement

that a medical opinion is consistent with an RFC "suggests that [the ALJ] first determined [the

plaintiff's] residual functional capacity and afterward chose to give great weight to medical

opinions coinciding with her predetermined finding. If so, [the ALJ] put the cart before the

horse. Residual functional capacity is determined *after* and *in light of* credible medical evidence,

not *before*."). The ALJ should not have assessed Dr. Skeene's findings and opinions relative to

the RFC; the fact that he did so suggests that the ALJ first determined Plaintiff's RFC and then

considered the medical opinions in light of that finding.

For all these reasons, Dr. Skeene's opinion does not provide substantial evidence for the

ALJ's RFC determination.

## 2. Dr. Sagapuram's opinion does not provide substantial evidence for the ALJ's RFC determination

It was also inappropriate for the ALJ to give the opinion of Dr. Sagapuram

"considerable" weight, as Dr. Sagapuram did not examine Plaintiff and his assessment of her

physical capacities is not supported by other evidence in the record. Dr. Sagapuram opined that

Plaintiff could lift ten pounds "occasionally," sit for six hours, and stand or walk for two hours.

(R. 435.) The ALJ found that the opinion "appears supported by the overall record" and,

although the ALJ conceded that the opinion was rendered "prior to the receipt of additional

medical evidence," he further determined that the evidence received at the hearing was

"consistent" with Dr. Sagapuram's opinion. (R. 25.)

"The general rule regarding the written reports of medical advisors who have not personally examined a claimant is that such reports deserve little weight in the overall evaluation of disability." *Cabibi v. Colvin*, 50 F. Supp. 3d 213, 236 (E.D.N.Y. 2014) (citing *Vargas v. Sullivan*, 898 F.2d 293, 295–96 (2d Cir. 1990)) (explaining that an "advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant" (citations omitted)); *see Hidalgo v. Bowen*, 822 F.2d 294, 298 (2d Cir. 1987) (holding that the testimony of a nonexamining medical advisor "does not constitute evidence sufficient to override the treating physician's diagnosis"); *Hilsdorf*, 724 F. Supp. 2d at 348 (finding that the report of a non-examining physician could not, standing on its own, support the ALJ's RFC determination (citing *Vargas*, 898 F.2d at 296)); *Filocomo v. Chater*, 944 F. Supp. 165, 170 n.4 (E.D.N.Y. 1996) (Reliance on an RFC assessment "completed by a doctor who never physically examined Plaintiff" would be "unfounded, as the conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little if any weight.").

Nevertheless, "the opinion of a non-examining consultant may constitute substantial evidence in support of the ALJ's determination where . . . other evidence in the record supports it." *Coburn v. Astrue*, No. 07-CV-0029, 2009 WL 4034810, at *6 (N.D.N.Y. Nov. 19, 2009) (citing *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995)); *see Ritter v. Astrue*, 32 F. Supp. 3d 193, 206 (N.D.N.Y. 2012) (stating that reliance on the opinion of a non-examining medical consultant "is particularly appropriate where, as here, the opinions of the medical consultants are supported by the weight of the evidence"); *Leach ex. rel. Murray v. Barnhart*, No. 02-CV-3561, 2004 WL 99935, at *9 (S.D.N.Y. Jan. 22, 2004) ("State agency physicians are qualified as experts in evaluation of medical issues in disability claims. As such, their opinions may

constitute substantial evidence if they are consistent with the record as a whole."); *Brunson v. Barnhart*, 01-CV-1829, 2002 WL 393078, at *14 (E.D.N.Y. Mar. 14, 2002) (holding that opinions of non-examining sources may be considered where they are supported by evidence in the record); 20 C.F.R. § 404.1527(c)(3) ("[B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.").

Dr. Sagapuram reviewed Plaintiff's medical records through June of 2012. (R. 437.) Although he noted Plaintiff's hematocrit level and that she had been diagnosed with anemia, he stated that she "has had only one transfusion of five units," (R. 437), contrary to the subsequent record of at least two additional hospitalizations, in June of 2012 and February of 2013, as a result of Plaintiff's anemia, both requiring blood transfusions and other treatment. Moreover, Dr. Sagapuram characterized Plaintiff's anemia as "chronic nutritional iron deficiency anemia, symptoms of dysphagia for solid foods," which is contrary to the evidence in the record, which indicates that Plaintiff's anemia was consistently caused by excessive blood loss and menorrhagia. (R. 437.) In addition, the ALJ did not identify the medical evidence that the ALJ concluded supported Dr. Sagapuram's findings as to Plaintiff's specific capacities with respect to lifting, sitting and standing. Absent support from the record, the opinion of Dr. Sagapuram, a non-treating source, was not entitled to the "considerable" weight assigned by the ALJ, and it fails to provide substantial evidence for the ALJ's determination that Plaintiff has the RFC for full sedentary work.

### 3. The ALJ's failure to note contradictory evidence

An additional reason that the ALJ's RFC determination is not supported by substantial evidence is that the ALJ failed to consider or address portions of Plaintiff's treatment record that contradict the medical evidence on which he relied or that identify any non-exertional limitation that could be present due to Plaintiff's conditions.

"[A]n ALJ is not required to discuss every piece of evidence submitted." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); *see also Fiedler v. Colvin*, 54 F. Supp. 3d 205, 218 (E.D.N.Y. 2014) ("[A]n ALJ 'is not required to discuss all the evidence submitted, and his failure to cite specific evidence does not indicate it was not considered.'" (quoting *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005)). However, "the Court must still be able to 'glean the rationale of an ALJ's decision.'" *McMahon v. Colvin*, No. 13-CV-4181, 2014 WL 3735910, at *10 (E.D.N.Y. July 29, 2014) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)); *see also Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) ("An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record "permits us to glean the rationale of an ALJ's decision.'" (quoting *Mongeur*, 722 F.2d at 1040)). An ALJ "may not simply ignore contradictory evidence . . . the ALJ must acknowledge the contradiction and explain why the conflicting [evidence] is being disregarded." *Arias v. Astrue*, No. 11-CV-1614, 2012 WL 6705873, at *2 (S.D.N.Y. Dec. 21, 2012); *see Poles v. Colvin*, No. 14-CV-6622, 2015 WL 6024400, at *4 (W.D.N.Y. Oct. 15, 2015) (holding that, where the ALJ omitted records that undermined his conclusion, the ALJ's conclusion was "improperly based on a selective citation to, and mischaracterization of, the record" and "not supported by substantial evidence" (citing *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82–84 (2d Cir. 2009)).

The ALJ noted Plaintiff's hospitalization in February of 2013 for "heavy vaginal bleeding and anemia," (R. 24), but omitted from his discussion her earlier hospitalizations for the same symptoms in November of 2010 and June of 2012.[15] Moreover, the ALJ did not discuss with any specificity the diagnoses of severe anemia and menorrhagia by doctors during Plaintiff's hospitalizations.[16] During Plaintiff's November 18 to 22, 2010 hospitalization for anemia and excessive vaginal bleeding, Plaintiff complained of dizziness, weakness, and chest tightness with radiation to the back. (R. 355–56.) Plaintiff reported an inability to climb stairs without stopping due to fatigue, although on examination, she was found to be without shortness of breath or weakness. (R. 355–56.) Plaintiff was given blood transfusions, (R. 1151), and diagnosed with menorrhagia, symptomatic anemia and suspected dysfunctional uterine bleeding, (R. 1162). During her hospitalization from June 7 to 12, 2012, she was diagnosed with "severe anemia," (R. 849, 936), and treated with multiple blood transfusions, (R. 873–76, 923). Plaintiff reported "several months" of mild fatigue, generalized weakness, and dizziness. (R. 923–24, 936, 1042.) Plaintiff was examined, found to be in no apparent distress, and was later assessed

---

[15] In assessing Plaintiff's credibility, the ALJ found Plaintiff's medical care to be "routine and conservative on the whole," after noting that her cancer treatment ended in 2008 and that the "majority of her treatment recently rendered was in association with bleeding and the need for a hysterectomy." (R. 24.) The ALJ stated that Plaintiff has needed blood transfusions "on occasion, but not consistently, over the period at issue." (R. 24.) The ALJ described Plaintiff's use of medications as "limited," "[a]side from [the use of medications] during procedures or in the course of hospitalization," and noted that at the time of her initial application, Plaintiff only reported taking an iron supplement and, at the time of her appeal, she reported taking one additional medication to control stomach acid. (R. 24.)

[16] Although the ALJ noted that Plaintiff had undergone a hysteroscopy, an invasive procedure to investigate and diagnose uterine bleeding, his RFC found her to be "post hysterectomy," a surgical procedure to remove the patient's uterus. (R. 23–24.) At the hearing, the ALJ, Plaintiff's counsel and Plaintiff each referenced Plaintiff's "hysterectomy." (R. 40, 57.) Plaintiff's medical record shows that Plaintiff was treated with a hysteroscopy on February 8, 2013. (R. 486–87, 503.) There is no medical evidence in the record that Plaintiff has had a hysterectomy.

as having no impairment in mobility or activity.  (R. 924, 990, 1007, 1012.)  While the ALJ was entitled to determine that Plaintiff's physical and non-exertional limitations were unaffected by the medical care Plaintiff received to treat her anemia and reported symptoms of dizziness and fatigue, it was improper for the ALJ to omit any mention of this evidence from his discussion. Accordingly, the ALJ's RFC determination is not supported by substantial evidence.

### 4.    The ALJ's duty to develop the record

Because there is not sufficient medical evidence supporting the ALJ's RFC determination that Plaintiff could perform sedentary work, the ALJ was obligated to develop the record and obtain a functional capacity assessment from Plaintiff's treating physician — previously, Dr. Fleming or, at the time of the hearing, Dr. Murtezani.  *See Marshall v. Colvin*, No. 12-CV-6401, 2013 WL 5878112, at *9 (W.D.N.Y. Oct. 30, 2013) ("Where a treating physician has not assessed a claimant's RFC, the ALJ's duty to develop the record requires that he *sua sponte* request the treating physician's assessment of the claimant's functional capacity." (first citing *Myers v. Astrue*, No. 06-CV-0331, 2009 WL 2162541 (N.D.N.Y. July 17, 2009); and then citing *Felder v. Astrue*, No. 10-CV-5747, 2012 WL 3993594 (E.D.N.Y. Sept.11, 2012))); *Aceto v. Comm'r of Soc. Sec.*, No. 08-CV-169, 2012 WL 5876640, at *16 (N.D.N.Y. Nov. 20, 2012) ("Since the ALJ had nothing more than treatment records and consultative reports to review, he had an affirmative duty to develop the record and request that Plaintiff's treating physicians assess her RFC.").

Although a "claimant has the general burden of proving that he or she has a disability within the meaning of the Act, . . . 'because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.'"  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration omitted) (first citing

*Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002); and then quoting *Melville v. Apfel*, 198

F.3d 45, 51 (2d Cir. 1999)); *see also Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33

(2d Cir. 2013) ("Unlike a judge at trial, the ALJ has a duty to 'investigate and develop the facts

and develop the arguments both for and against the granting of benefits.'" (quoting *Vincent v.

Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011))).  This duty is present "[e]ven when a

claimant is represented by counsel."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)

(collecting cases); *see Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) ("[T]he ALJ's general

duty to develop the administrative record applies even where the applicant is represented by

counsel . . . ."); *Doria v. Colvin*, No. 14-CV-7476, 2015 WL 5567047, at *7 (S.D.N.Y. Sept. 22,

2015) ("The ALJ's duty to develop the record includes a duty to resolve apparent ambiguities

relevant to the ALJ's disability determination." (citation omitted)); *Rockwood v. Astrue*, 614

F. Supp. 2d 252, 279 (N.D.N.Y. 2009) ("[A]n ALJ has an affirmative duty to develop the record,

even if the claimant is represented by counsel, if the medical record is ambiguous or incomplete.

(first citing *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); and then citing *Rosa v. Callahan*,

168 F.3d 72, 79 (2d Cir. 1999))).

   An ALJ does not need to affirmatively obtain the RFC opinion of a treating physician

where there are no obvious gaps in the medical history.  *Swiantek obo MLS v. Comm'r*, 588 Fed.

App'x 82, 84 (2d Cir 2015); *see Tankisi v. Comm'r*, 521 Fed. App'x 29, 33–34 (2d Cir. 2013)

(holding that the absence of a medical source statement from a claimant's treating physicians is

not necessarily fatal to the ALJ's determination); *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir.

1999) (explaining that the ALJ must attempt to fill "clear gaps" in the record, but "where there

are no obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'" the

ALJ is under no obligation to seek additional information); 20 C.F.R. § 404.1520b(c)(1)

(requiring the ALJ to obtain additional evidence only if the ALJ cannot decide whether a claimant is disabled based on the existing evidence). Nevertheless, while an ALJ may, in some circumstances, proceed without a medical source opinion as to the claimant's functional limitation, there must still be "sufficient evidence" for the ALJ to properly make the RFC determination. *See Sanchez v. Colvin*, No. 13-CV-6303, 2015 WL 736102, at *6 (S.D.N.Y. Feb. 20, 2015) ("Significantly, the administrative record here is a far cry from [those], which have excused the ALJ's failure to seek a treating physician's opinion based on the completeness and comprehensiveness of the record."); *Downes v. Colvin*, No. 14-CV-7147, 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015) (noting that "the treatment notes and test results from [the plaintiff's] treating physicians do not assess how [the plaintiff's] symptoms limited his functional capacities" and remanding for further findings); *cf. Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) ("Given the extensive medical record before the ALJ in this case, we hold that there were no 'obvious gaps' that necessitate remand solely on the ground that the ALJ failed to obtain a formal opinion from [the] treating physicians . . . ."); *Tankisi*, 521 F. App'x at 34 (emphasizing the "extensive record" available to the ALJ).

At the hearing, the ALJ stated that the record, while extensive, did not clearly indicate the "nature and severity" or duration of Plaintiff's anemia, especially before a recent "increase in activity." (R. 42.) The ALJ told Plaintiff's counsel that he needed "assistance in trying to better understand the nature of the claim," (R. 39), and indicated that "perhaps, there's a treating source from New York Hospital of Queens, who can perhaps fill in the blanks or provide an opinion" because he "didn't see anything in the file aside from the . . . consultative examiner," (R. 42). The ALJ left the record open after the hearing to allow Plaintiff's counsel to attempt to obtain "some clarifying statement or a narrative" from Dr. Murpezani. (R. 43.) The ALJ stated that he

"trust[ed Plaintiff's counsel] would develop the case as [he] saw fit," (R. 43), and stated that

counsel could "see about a narrative and . . . any other records," (R. 72). The ALJ stated that,

"especially in this case where there are seemingly some gaps, we want to make sure we . . . have

everything we possibly can." (R. 73.)

Here, the record was not sufficiently developed for the ALJ to assess Plaintiff's RFC, and

it was the ALJ's burden to develop the record. Although Plaintiff's counsel submitted records

from Dr. Murtezani at the close of the hearing, (R. 43, 1410–33), as well as records of Plaintiff's

hospitalization in April of 2013, (R. 1436–50), it was the ALJ's duty to follow up and obtain an

opinion from Dr. Flemming or Dr. Murtezani, including an assessment of any non-exertional

limitations resulting from Plaintiff's anemia, such as the fatigue and dizziness that she

complained of on multiple occasions. Absent such a determination, the objective medical

evidence provides minimal insight into Plaintiff's functional limitations, despite reflecting the

extensive history of her treatment for esophageal tumors and anemia. Thus, it is unclear where

the ALJ obtained support for his conclusions. Given the ALJ's failure to develop the record as to

the opinions of Plaintiff's treating physicians and the lack of support for his RFC assessment, the

Court vacates the Commissioner's decision and remands for further fact finding.

### ii. The Court cannot further assess whether the ALJ properly assessed Plaintiff's credibility

Plaintiff also argues that the ALJ erred in finding that she was not credible as to the

intensity, persistence and limiting effects of her impairment because the ALJ improperly

weighed whether Plaintiff's testimony was consistent with the medical evidence in the record.

(Pl. Mem. 15.) Plaintiff further argues that the ALJ erred in his application of the

Medical-Vocational Guidelines. (*Id.* at 16–17.) Because the Court remands the case for further

development of the medical evidence, the Court will not address Plaintiff's remaining arguments,

as the ALJ's errors impact the Court's ability to review the ALJ's credibility determinations and application of the Guidelines.

### III. Conclusion

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is granted and the Commissioner's cross-motion for judgment on the pleadings is denied. The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 28, 2016
      Brooklyn, New York